OPINION.
The plaintiff-appellant, Pamela Worpenberg, appeals from the order of the trial court granting summary judgment to the defendants-appellees, The Kroger Company and three of its employees, in an action arising out of Worpenberg's resignation from the company. Worpenberg, a front-end manager, resigned during a meeting in which the company was investigating accounting errors ("misrings") made by her, and in which she felt that she was being unjustly accused of theft. Worpenberg's action included claims of intentional infliction of emotional distress, invasion of privacy, and what she referred to as "publicity torts" and "negligent damage to reputation."
In her single assignment of error, Worpenberg asserts that summary judgment on her claim of intentional infliction of emotional distress was improper because the conduct of Kroger and its employees was sufficiently extreme and outrageous to support such a claim. She also contends that the trial court erred by determining that her claims for "publicity torts, "negligent damage to reputation," and invasion of privacy were barred by the applicable statute of limitations. For the reasons that follow, we affirm.
 I.
On September 2, 1997, Worpenberg was called into the manager's office of the Kroger grocery store in Mason, Ohio, where she worked as a front-end manager in the video department. She was met there by Judy Oeters, a trainer for the store, and Charles Greenert, a member of the company's Risk Management Department. She was advised of inaccuracy in her records due to an unusual number of misrings. The company was concerned with the number of misrings and with a particular misring involving the sum of $200. Worpenberg testified on deposition that although she was told by Oeters that she was not being accused of theft, the tenor of the remarks directed at her were overtly accusatory. For example, she testified that Greenert said to her, "We're not accusing you of theft. We just want to know where the $200 is. * * * Come on Pam. Tell me where the $200 is."
Worpenberg became indignant. According to Worpenberg, she reviewed the records herself and determined that there was, in fact, an overage, not a shortage. Worpenberg accepted responsibility for the misrings. She testified, however, that when she asked whether the till had balanced, she was refused an answer even though, she alleged, both Oeters and Greenert knew that there was no money missing. She testified that, despite their being an overage, not a shortage, Greenert continued to insinuate that she had behaved dishonestly, telling her at one point, "We're watching you with the cameras, Pam. We've got you on film."
At the end of the meeting, Worpenberg was asked to prepare a written statement and was then advised that she was being suspended pending further investigation. Worpenberg's response was dramatic. She testified that she said, "No, I quit. I don't need this f'ing [sic] job. I can get a job anywhere." She testified that she then told Greenert that she expected an apology after an investigation exonerated her. Greenert told her that if she quit there would be no further investigation.
Worpenberg then left the meeting and went outside the manager's office to her desk, where she began collecting pictures of her children to take home. Two of her co-workers, one of whom was Nancy Rhoades-Meiller, her immediate supervisor, watched her. Worpenberg testified that she said to Rhoades-Meiller, "Is this what you think of me, Nancy? You think I would take money? Is that what you fucking think? I take money? You think I would take money?" To a third co-worker, Brent Cox, who tried to calm her down, she testified that she said, "What would you do in this situation, Brent? You would do the same thing. This is terrible. They accused me of theft."
Worpenberg testified that she then collected her purse and left the store. The next day she had a meeting in the office of Glenn DuBrucq, the zone manager responsible for the Mason store. Oeters was also at the meeting. Worpenberg complained to DuBrucq that no one would tell her how the till had balanced. DuBrucq instructed Oeters to tell her. Oeters said that the till showed an overage of $105. Worpenberg testified that she then explained to DuBrucq that the misrings had not caused any shortage. She stated that DuBrucq expressed surprise and then anger at Oeters, saying, "What the hell is this, Judy?" The meeting concluded with DuBrucq promising to investigate the matter further and to call Worpenberg.
Less than a week later, Worpenberg was called back to speak with DuBrucq. According to Worpenberg, DuBrucq told her at their meeting, "Pam, I investigated you. The company has investigated you. You did nothing wrong." DuBrucq also advised her, however, that she was wrong to have cursed at Oeters and Greenert, and that certain people wanted to see her demoted to assistant front-end manager because of her behavior during that interview. Worpenberg was unapologetic and refused to accept a demotion. She asked for a letter of recommendation. DuBrucq replied that he would "[a]bsolutely" give her one.
As soon as Worpenberg got home from the meeting, she received a telephone call from John Schroeder of Human Resources. She testified that Schroeder told her, "Pam, Mr. DuBrucq is devastated. He won't take away your title. He won't take away your money. And in three months you can get in the [management training] program, at Christmas time, when it comes through. It's a promise of his." Worpenberg responded that she would consider the offer.
In the days that followed, Worpenberg spoke to a friend of hers, a worker at Kroger's Tylersville store, who advised her strongly that she should come back to work to publicly demonstrate her innocence. Worpenberg then called DuBrucq and told him that she would return. She testified that DuBrucq told her, "I don't think you will ever realize how happy this makes me." Worpenberg stated, however, that she told DuBrucq that she only wanted to work at the Tylersville store. DuBrucq responded that she was badly needed at the Forest Park store. Worpenberg testified that she felt that she was being reassigned to "a punishment store" and balked. Worpenberg ultimately decided not to take the position. When asked why, she testified,
 I felt, when I thought about it in depth, that going back I would not move ahead in my career as I had. I felt this was a black mark on me. I knew how they talked about theft in the store and how people were made fun of. And I knew that it was already all over all the stores and I didn't see any career there anymore.
 II. In her first assignment of error, Worpenberg argues that the record in the trial court created a triable issue of whether Kroger's conduct toward her was sufficiently egregious to establish a claim of intentional infliction of emotional distress. She identifies two aspects of Kroger's behavior as being actionable: (1) that Oeters and Greenert accused her of theft when, she alleges, both knew that no money was missing; and (2) that the company failed to take appropriate steps to allay and quash rumors among its employees that she had been caught stealing.
In Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 453 N.E.2d 666, the Ohio Supreme Court recognized the tort of intentional infliction of emotional distress as embodied in 1 Restatement of the Law 2d, Torts (1965) 71, Section 46(1). That section imposes liability upon anyone "who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another," resulting in either emotional or bodily harm. In order to establish the tort, a plaintiff is required to show the following:
 the defendant either intended, or should have anticipated, the emotional distress caused by his or her actions;
 the conduct was "so outrageous in character, and so extreme in degree" that it transgressed all societal bounds of decency and should be regarded as "atrocious," and "utterly intolerable";
the conduct proximately caused the psychic injury; and
 the emotional distress was "serious," meaning that a reasonable person would be unable to adequately cope with it.
 1 Restatement of the Law 2d, Torts (1965) 73, Section 46, Comment d; Yeager, supra, at 375, 453 N.E.2d at 671; Paugh v. Hanks (1983), 6 Ohio St.3d 72, 451 N.E.2d 759, paragraph 3a of the syllabus.
Worpenberg argues that both Oeters's and Greenert's behavior was sufficiently outrageous to meet the legal criteria for liability because they insinuated that she had taken money when they both knew that no money was missing. Her argument is premised upon the supposition that Oeters and Greenert engaged in an unnecessarily hurtful charade. Both Oeters and Greenert testified, however, that they were genuinely concerned that the unusual number of misrings attributed to Worpenberg revealed some undetermined wrongdoing. As Oeters testified upon deposition, the number of misrings was difficult to explain for an employee of Worpenberg's high caliber, and so she and Greenert decided that "there was enough of a pattern that * * * it couldn't be a one-time mistake, a one-time whoops."
Oeters testified that she and Greenert were more concerned with why Worpenberg had made so many misrings, not necessarily whether any money was missing. According to Oeters, when pressed for an explanation of the misrings, and specifically the $200 misring, Worpenberg jumped to the conclusion that she was being accused of theft, which was not necessarily the case.
Greenert's testimony corroborated that of Oeters. He testified that the investigation began as a result of co-workers reporting that Worpenberg was "forced balancing." The co-worker tips were validated when an investigation revealed an unusually high number of misrings attributable to Worpenberg. With respect to the misring involving $200, Greenert admitted that he had been told that there was an overage even with the misring. Greenert testified, however, that this information did not completely allay his suspicion of Worpenberg. He stated that he still did not understand why the misring had occurred and that he wanted an explanation for what he described as a "$200 discrepancy from what was recorded on the video sales report as to what was recorded on the detail tape." According to Greenert, he was still asking himself, "[W]here did the $200 go?" He testified that even with the overage, Worpenberg "couldn't explain why she recorded these sales as she did," and that Worpenberg admitted that she had engaged in the practice of forced balancing.
Given this backdrop for the discussion that occurred among Worpenberg, Oeters, and Greenert, we agree with the trial court that nothing was said or done in the meeting that would have justified a claim of intentional infliction of emotional distress. Certainly there was no evidence that either Oeters or Greenert had acted beyond the bounds of decency. Their meeting with Worpenberg was conducted in private, behind closed doors, without any attempt to humiliate or embarrass her in front of her co-workers. Kroger expeditiously conducted a further investigation of the matter, even after Worpenberg had quit, and exonerated her. She was then offered continued employment with the promise of management training. Nothing in the behavior of the company or its employees suggested that the investigation into the misrings was prompted by an intention to gratuitously inflict emotional pain upon Worpenberg. Indeed, the company appears to have taken immediate steps to ameliorate any hurt or insult Worpenberg may have felt as a result of the investigation.
Worpenberg also argues that Kroger intentionally inflicted emotional pain upon her by failing to take steps to quash any rumors that surfaced regarding the incident. According to Worpenberg, not only did Kroger fail to take any affirmative action to clear her name, but the company and its employees "fostered the belief that [she] was a thief."
Kroger remonstrates, and we agree, that Worpenberg must bear responsibility for any rumors that arose as a result of her outburst following the interview, in which she loudly proclaimed to two of her co-workers that she was being investigated for theft. Further, the record shows that Kroger did take steps to fend off rumors. Nancy Rhoads-Meiller testified that she told the department heads and managers at the Mason store that Worpenberg had "admitted to some mistakes ringing up the video register," and that she had chosen not to accept reassignment. Greenert testified that when people approached him to ask about Worpenberg, he told them that she was very well liked and had quit. He denied telling anyone that she had been involved in theft. Oeters testified that the only thing that she had said about the incident to anyone else was that Worpenberg was "misringing the video till and she got upset and quit."
On this record, we can find no evidence that Kroger or its employees did anything outrageous or shocking to the conscience by "foster[ing] the belief that [she] was a thief." Although Worpenberg argues that the company could have done more to dispel any rumors among its workforce, the fact that it did not do more did not make the company's behavior so "atrocious" or "utterly intolerable" to justify a claim of intentional infliction of emotional distress. It cannot be overlooked that the company did, in fact, offer Worpenberg further employment with management training — an offer that, if accepted, would have waylaid any rumors that she was caught stealing.
Because we hold that the actions of Kroger and its employees were not of the character necessary to support a claim of intentional infliction of emotional distress, we need not address the company's argument that such a claim was preempted by Section 301 of the Labor Management Relations Act, Section 185(a), Title 79, U.S. Code.[1]
 III.
In the second issue presented under her first assignment of error, Worpenberg argues that the trial court erred by ruling that her claims for negligent damage to reputation, invasion of privacy, and what she referred to as "the publicity torts" were time-barred. We consider each of these claims in turn.
 A. Count I
In the first count of her amended complaint, Worpenberg accused Kroger and its employees of breaching "their duty to [her] by allowing false statements and impressions that [she] was involved in theft from Kroger to be circulated in the community and by not exercising reasonable care to assure that [her] reputation * * * would not be damaged by their false accusations of theft * * *." Identifying this as a claim of "negligent damage to reputation," as opposed to a claim of defamation, Worpenberg argues that the claim was governed by a two-year statute of limitations under the Ohio Supreme Court's holding in Lawyer's Co-OperativePublishing Company v. Muething (1992), 65 Ohio St.3d 273, 603 N.E.2d 969.
Initially we note that Worpenberg's reliance on Muething begs the question whether the Ohio Supreme Court in that case recognized "negligent damage to reputation" as a distinct tort. In Muething, the plaintiff sought to recover for damage to his professional reputation as a result of the defendant's negligence in a product-liability case. Observing that the plaintiff's claim for damage to his reputation was "indistinguishable from his claim for intentional infliction of emotional distress, and, therefore, could not be maintained in the absence of an assertion that he feared or saw some quantifiable physical loss," the court applied a two-year statute of limitations pursuant to R.C. 2305.10. But the court's holding fell significantly short of recognizing a separate claim for reputational damage on a theory of ordinary negligence.
According to Kroger, the trial court was correct in applying a one-year statute of limitations to this claim, pursuant to R.C. 2305.09(D), because it was, in essence, a "disguised defamation" claim. This argument raises the question of when a claim for reputational harm sounds in defamation. See Silbaugh, Sticks and Stones Can Break My Name: Nondefamatory Negligent Injury to Reputation (1992), 59 U.Chi.L.Rev. 865, 868. Silbaugh identifies two vastly different approaches to this issue. The first approach is simply to treat any claim for damage as necessarily a defamation claim — the "defamation as the only game in town" approach. The second approach is to assume without analysis that injury to reputation is a recoverable item of damage from negligent conduct — an approach represented by "a small number of recent cases in different jurisdictions." Id. at 868, 870. The second approach divides itself into two different groups: (1) courts that limit plaintiffs to defamation claims if an explicit or implicit element of communication is present, and (2) courts that allow negligence claims to survive in spite of a communication if the complaint addresses other, noncommunicative negligent conduct by the defendant. Id. at 870-874.
Significantly, Silbaugh observes that some plaintiffs attempt to characterize their claims outside of defamation to avoid the statute of limitations. Id. at 877. The author disapproves of such a practice, arguing that plaintiffs should not be allowed to avoid otherwise applicable procedural requirements "if their claims are otherwise complete under defamation." Id. A claim is "complete under defamation" if, under the facts, it hinges upon the defendant communicating something by speech or conduct. Id. As defined in the Restatement of the Law 2d, Torts, "communication" is a term of art used to "denote the fact that one person has brought an idea to the perception of another." 1 Restatement of the Law 2d, Torts (1977), Section 559, Comment.
Worpenberg's claim presented in her first count concerned the company's failure to take steps to quell the loose talk among its employees concerning the circumstances surrounding her departure from the company. Arguably this was conduct (or, more precisely, a failure to act), rather than communication. Significantly, however, the claim then alleged that Kroger's duty to take such remedial steps arose as a result of the company's "false claims of theft." In other words, the claim was expressly predicated on the company having communicated "false claims of theft" to its employees, i.e., having communicated to its employees the idea that Worpenberg was a thief and then doing nothing to repair the damage caused by that false claim.
We hold that the trial court did not err when it characterized Worpenberg's claim in her first count as a "disguised defamation" claim, since the claim was expressly premised upon a "communication" as defined by the Restatement. Indeed, if we were to accept Worpenberg's argument that this claim did not sound in defamation, then every person accused of defaming another would be susceptible to two distinct torts: the first sounding in defamation based upon the statement itself, and the second sounding in negligence based upon the defendant's failure to take reasonable steps to repair or control the damage caused by the statement.
Because we hold that Worpenberg's first claim sounded in defamation and was thus time-barred, we need not reach the larger question whether Ohio does, in fact, recognize a non-defamatory tort for reputational harm. As we have noted, Muething does not stand for such a broad proposition, nor can we find any Ohio case law in which the tort has been independently recognized.
 B. Count III
In the third count of her complaint, Worpenberg claimed that Rhoads-Miller gave "false information" to Kroger employees who inquired about her departure, and that this constituted an "unwarranted publicizing of [her] private affairs to members of the public and Kroger employees, about which said persons had no legitimate concern * * *." According to Worpenberg, this was a claim of invasion of privacy rather than of defamation, and should have been subject to a four-year statute of limitation pursuant to R.C. 2305.09(D).
While we agree that a claim of invasion of privacy is subject to a four-year statute of limitations, see Killea v. Sears, Roebuck Co. (1985), 27 Ohio App.3d 163, 499 N.E.2d, we do not agree that the language of Count III purely set forth such a claim. As can be seen, this claim expressly relied upon the alleged falsity of the information that was disseminated to Kroger employees. Absent the allegations of falsity, there was language that sounded in privacy, e.g., "[t]he conduct of the Defendant Rhoads-Meiller was an unwarranted publicizing of the Plaintiff's private affairs, about which said persons had no legitimate concern." But elsewhere the claim again sounded in defamation, stating that "[a]s a direct and proximate result of the conduct of the Defendant, the Plaintiff's reputation has been damaged, and continues to be damaged, by the circulation of false information that the Plaintiff was involved in theft from Kroger."
In determining which statute of limitations should be applied to a particular action, a court "must look to the actual nature or subject matter of the case, rather than to the form in which the action is pleaded. The grounds for bringing the action are the determinative factors[;] the form is immaterial." Hambleton v. R.G. Barry Corp. (1984), 12 Ohio St.3d 179, 183, 465 N.E.2d 1298, 1302.
Although Count III contained elements of both defamation and invasion of privacy, the predominant subject matter — or gravamen was the alleged damage to Worpenberg's reputation caused by the alleged "circulation of false information." Therefore, we cannot say that the trial court erred by also treating this count as a defamation claim. After subtracting the element of alleged falsity from the claim, what remained was merely the charge that Kroger and its management personnel had told its employees why Worpenberg had left. Absent any evidence that this information was confidential, there is no basis in the record to show that anything that Kroger or its employees did or said intruded upon Worpenberg's private affairs, or that such an intrusion was offensive or objectionable to a reasonable person. See Contadino v. Tilow (1990),68 Ohio App.3d 463, 589 N.E.2d 48. The essence of the claim was clearly, therefore, defamation.
 C. Count IV
In the fourth count of Worpenberg's complaint, she alleged that Kroger and its employees "publicized, and/or allowed to be publicized, information about [her] which led Kroger personnel and members of the public to believe that [she] was involved in theft. Such conduct * * * would be highly offensive to a reasonable person, and was highly offensive to [Worpenberg]. Further, said information was o[f] no legitimate concern to said Kroger personnel."
Under the same analysis applied to Count III, it is clear that the gravamen of this claim was the allegation that Kroger had falsely accused Worpenberg of theft. Absent the allegation of falsity, there was no invasion of privacy, since merely telling employees non-confidential information about a former co-worker would not have been an intrusion into anyone's privacy. We hold, therefore, that the trial court correctly treated this claim as one sounding in defamation and therefore subject to a one-year statute of limitations.
Accordingly, Worpenberg's sole assignment of error is overruled, and the judgment of the trial court affirmed.
Judgment affirmed.
PAINTER and SUNDERMANN, JJ., concur.
[1] Worpenberg's employment was covered by a collective-bargaining agreement between Kroger and the United Food and Commercial Workers Union. Worpenberg did not file a grievance as a result of the company's treatment of her. Kroger argues that the determination of Worpenberg's claim of intentional infliction of emotional distress would have involved interpretation of the union contract and thus impermissibly involved the trial court in an area preempted by federal labor law. See Allis-ChalmersCorp. v. Lueck (1985), 471 U.S. 202, 105 S.Ct. 1904; Honchell v. G.E. (1995), 100 Ohio App.3d 527, 654 N.E.2d 402; but, see, Farmer v. UnitedBrotherhood of Carpenters and Joiners of America (1997), 430 U.S. 290,97 S.Ct. 1056; and Bottle Beer Drivers, Beer Soft Drink Bottlers AlliedWorkers Local Union No. 1199 v. Dameron (Dec. 4, 1998), Hamilton App. No. C-970922, unreported.